IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | CRIMINAL ACTION |
| v. | : | |
| | : | NO. 18-524 |
| VICTOR CLAYTON | : | |
| | : | |

**MEMORANDUM**

**SURRICK, J.**                                                **JUNE 4, 2020**

Presently before the Court is Defendant Victor Clayton's Motion to Suppress All Evidence and Statements Obtained as a Result of the Warrantless Search and Arrest on March 15, 2018.  (ECF No. 56.)  Clayton's Motion will be granted in part and denied in part.

**I.      BACKGROUND**

The Baymont Inn and Suites is a two-story motel in Dunn, North Carolina.  Its rooms are accessible by exterior doors, rather than by an interior hallway.  An exterior stairway allows access to the second floor, with half of the rooms on one side of the stairway and the other half of the rooms on the other side of the stairway.  Occupants are able to park their vehicles in front of the ground floor rooms.  (Transcript of March 13, 2020 Suppression Hearing ("Tr.") at 7-8, 20-21, ECF No. 67.)

At approximately 8:00 a.m. on March 15, 2018, Sergeant Calvin Johnson of the Dunn Police Department received a request to report to the Baymont.  (*Id*. at 5-7.)  He was advised that there was a missing juvenile at the location, as well as potential solicitation and drug activity.  (*Id*. at 8.)  Around the same time, Officer Megan Dean of the Dunn Police Department also

received a radio dispatch to report to the Baymont in regard to a missing juvenile and potential solicitation.  (*Id*. at 17-20, 28-29.)

Johnson and Dean arrived at the Baymont around the same time.  (*Id*. at 7, 19, 29-30.) Shortly after their arrival, they found a girl sitting on the stairway.  She appeared to be about 14 to 16 years old.  (*Id*. at 9, 20.)  The girl ("Minor 1") informed the officers that she was a runaway and that she had been staying in Room 214 with another missing girl ("Minor 2") and a male. She also informed the officers that she and Minor 2 were being prostituted and that the man and Minor 2 were in the room.  (*Id*. at 9, 20, 31.)  After speaking with Minor 1, the officers placed her in Johnson's patrol car and confirmed through the National Crime Information Center that she was in fact a missing juvenile.  (*Id* at 10.)  Dean and Johnson then proceeded to Room 214. (*Id*. at 10, 21.)

Neither Dean nor Johnson remembers how exactly they entered Room 214.  They believe either that the door was open or—more likely, according to Dean—that someone let them in after knocking.  They are sure, however, that they did not force themselves into the room.  (*Id*. at 10-11, 21-22, 33.)  Once they entered the room, they saw two beds to the right of the doorway.  One bed was empty.  In the other bed were Minor 2 and Clayton.[1]  Minor 2 appeared to be about 14 to 16 years old and was scantily clothed.  (*Id*. at 11-12, 21-23, 34-35.)   The officers instructed Minor 2 to get out of the bed and put on more clothes.  Dean took her to the bathroom to comply, while Johnson stayed with Clayton.  (*Id*. at 12, 21-23.)

Dean transported one of the juveniles back to the Dunn Police Department.  She does not recall which minor she transported, but she believes that she left the motel at about 8:30 a.m. She also recalls that when she returned to the police station, both minors were present.  She

---

[1]      The record reflects that only Minor 2 and Clayton were in the room at the time.

believes that another law enforcement officer, Lieutenant Hanson, transported the other minor from the motel to the police department.  (*Id*. at 23-24.)[2]

Meanwhile, Sergeant Charles Barbour of the Dunn Police Department arrived at the Baymont shortly before 9:00 a.m.  (*Id*. at 39-41.)  After he arrived, he went to Room 214 and spoke to Johnson.  (*Id*. at 41.)  He saw Clayton handcuffed to the bed closest to the door.  By this time, neither of the minors was present.  (*Id*. at 42.)  Johnson asked Barbour to take Clayton to Barbour's car, which Barbour did.  Barbour understood that Clayton was being detained and that he was to sit with Clayton in his police car.  (*Id*.)  He also understood, as per Johnson, that the FBI was being contacted.  (*Id*. at 42-43.)

Barbour sat with Clayton in his vehicle for about four hours.  During that time, Clayton was in the front passenger seat, beside Barbour.  (*Id*. at 43.)  According to Barbour, he kept Clayton in the parking lot of the Baymont because the Dunn Police Department was a very small building and he did not want to risk Clayton running into the minors there.  (*Id*.)  Barbour testified that while he was in the car with Clayton, he told Clayton that he was being detained pending the arrival of other investigators.  (*Id*. at 44.)  He does not recall Clayton asking to use the restroom or taking Clayton to a restroom.  (*Id*.)  He also does not recall Clayton asking for food or giving Clayton food while they were in the car.  (*Id*. at 44-45.)

While Barbour and Clayton were still at the motel, other law enforcement officers interviewed the two minors at the Dunn Police Department.  They wanted to get as much information from the minors before interviewing Clayton  (*Id*. at 80-81.)  The minors were interviewed separately and each of the interviews lasted about 45 to 60 minutes.  (*Id*. at 80-84.)

---

[2]      We do not know Lieutenant Hanson's first name.

At about 1:15 p.m., Barbour took Clayton to the Dunn Police Department.  (*Id*. at 45.)
When they arrived in Barbour's office, Barbour offered Clayton food and drink.  Clayton
accepted a bottle of water and some crackers.  (*Id*. at 45.)  At about 1:25 p.m., Clayton was
Mirandized by Barbour and FBI Special Agent Kiernan Whitworth, who had since arrived at the
Dunn Police station.  (*Id*. at 60-61, 77-79.)  Clayton then signed a form acknowledging his
*Miranda* rights, without resistance.  (Ex. 3; Tr. at 60-61.)  A video shows that Barbour and
Whitworth read Clayton his *Miranda* rights before they began asking him questions.  Based on
the video and transcript of the video, Clayton appeared to understand those rights and did not
appear resistant.  (Ex. 4; Tr. at 57-59, 85-87.)  The bottle of water Barbour gave to Clayton also
appears in the video.  (Ex. 4; Tr. at 59.)

Barbour and Whitworth interviewed Clayton together, for about an hour.  (Tr. at 45, 61,
80.)  Another video shows that at the conclusion of the interview, Clayton acknowledged that
Barbour had been "fair" to him that day.  (Ex. 5; Tr. at 62, 89-90.)  The video also shows
Barbour offering Clayton more food and water.  (Ex. 5; Tr. at 62.)

Clayton was formally placed under arrest following the interview and was taken to jail at
approximately 4:00 p.m. that day.  (*Id*. at 45-46, 64.)  He was not taken back to the Baymont
before being arrested.  (*Id*. at 74.)

At some point after March 15, 2018, the FBI obtained from the Dunn Police Department
two cell phones belonging to Clayton.  The FBI did not search those phones until after they
obtained search warrants.  (Tr. at 75-76.)  The FBI also obtained two additional cell phones
belonging to the minor victims.  (*Id*. at 76-77.)[3]

---

[3]     The record does not establish how and where law enforcement obtained the minors' cell
phones.

On July 24, 2019, a grand jury returned a two-count Indictment charging Clayton with knowingly recruiting, enticing, harboring, transporting, providing, obtaining, and maintaining Minor 1 and Minor 2, and attempting to do so, knowingly and in reckless disregard for the fact that Minor 1 and Minor 2 were under the age of 18 and would be caused to engage in commercial sex acts, in violation of 18 U.S.C. §§ 1591(a)(1) and 1594(a).  (ECF No. 1.)  On February 7, 2020, Clayton filed a Motion to Suppress All Evidence and Statements Obtained as a Result of the Warrantless Search and Arrest on March 15, 2018.  (Def.'s Mot., ECF No. 56.) The Government filed a response in opposition on February 28, 2020.  (ECF No. 62.)   A suppression hearing was held on March 13, 2020.  (ECF No. 67.)

At the March 13 suppression hearing, the Government introduced two property receipts showing that two cell phones belonging to Clayton were seized from Room 214 at about 8:40 a.m. on March 15, 2018.  (Ex. 1.)  Hanson filled out these forms.  Although the receipts indicate that Officer Dean seized the phones, she testified that she did not seize any evidence from Room 214 and that it is possible Hanson made a mistake when filling out the forms.  (Tr. at 25-28.) She testified that although it is possible her memory is mistaken and that she did in fact obtain the phones, she doubts that that is what happened.  (*Id*. at 37.)  Barbour also testified that based on his observation of events on March 15, 2018, it is possible that the forms were incorrect.  (*Id*. at 56.)  He also testified that although he does not recall specifically, it is possible he was the one who obtained the two phones belonging to Clayton.  (*Id*.)

The Government also introduced two consent-to-search forms, one for Room 214 and the other for Clayton's car, which was in the Baymont parking lot.  (Ex. 2; Tr. at 46-47.)  Clayton executed both forms without any resistance.  (Ex. 2; Tr. at 48.)  There is no timestamp on the forms, but the forms indicate that Clayton signed them at the police station.  (Ex. 2; Tr. at 47, 49,

67.)  Barbour does not recall when Clayton signed the consent forms.  (*Id*. at 49.)  Barbour testified that pursuant to his typical practice, a suspect would be present during the search so he or she could "revoke the consent at any time."  (*Id*.)  He also recalls that at some point after 10:00 a.m., while he was waiting at the motel with Clayton, Butch Halpin of the Dunn Police Department arrived and took photographs of Room 214 and Clayton's vehicle.  (*Id*. at 49-50.)  Relying on a Computer-Aided Dispatch ("CAD") report, Barbour testified that the search of the car and room began at 12:42 p.m. and ended at 1:15 p.m.  (*Id*. at 50-51; Ex. 7.)  Barbour recalls that he was involved with the search of the vehicle and that during the vehicle search, he frequently looked back at his car to make sure Clayton was still there.  (Tr. at 50, 73.)  No search warrants were ever obtained for the room or the car.  (*Id*. at 67.)

Finally, the Government introduced some photographs of Room 214, taken by Halpin. (Ex. 6; Tr. at 52.)  The photographs show that upon entrance into the room, there was a TV stand against a wall on the left on which various coins, a towel, and a cell phone were spread out.  In the background were a vanity and sink, around which were various toiletries and a one-quart beverage of some kind.  Two boxes of pizza and various receipts were also in the room.  (Ex. 6; Tr. at 52-54.)  Halpin also took a few pictures of Clayton's vehicle, which, according to some of the receipts and a rental agreement, was a rental vehicle.  (Ex. 6; Tr. at 54-55.)  The record does not establish whether these photographs show Room 214 and Clayton's vehicle as they were at the time Dean and Johnson arrived on scene, or whether items had since been moved.

On April 10, 2020, Clayton filed a Supplemental Brief in further support of his Motion. (ECF No. 69.)  The Government filed a Supplemental Opposition on April 30, 2020.  (Gov. Supp. Opp., ECF No. 73.)  On May 14, 2020, Clayton filed a reply.  (ECF No. 75.)

## II.      DISCUSSION

Clayton asserts multiple constitutional violations, including law enforcement's:

(1) warrantless entry into Room 214; (2) unreasonable detention of Clayton following their entry

into Room 214; and (3) failure to obtain a warrant or valid consent to search Room 214 and

Clayton's rental vehicle.  According to Clayton, these violations render inadmissible all evidence

obtained from the searches, as well as the statements he made to law enforcement on March 15,

2018.  We agree that law enforcement's failure to obtain proper consent before conducting the

warrantless searches renders all evidence seized from those searches inadmissible.  However, we

conclude that Clayton's statements to law enforcement are admissible.

### A.      Clayton had a reasonable expectation of privacy in the motel room

The Fourth Amendment to the U.S. Constitution states that

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. amend IV.  The Amendment "imposes two requirements.  First, all searches and

seizures must be reasonable.  Second, a warrant may not be issued unless probable cause is

properly established and the scope of the authorized search is set out with particularity."

*Kentucky v. King*, 563 U.S. 452, 459 (2011).

To invoke the protections of the Fourth Amendment, a defendant must have standing, i.e.,

a "legitimate expectation of privacy in the invaded place."  *United States v. Cortez-Dutrieville*,

743 F.3d 881, 883 (3d Cir. 2014); *see also United States v. Varlack Ventures, Inc.*, 149 F.3d 212,

215 (3d Cir. 1998) (stating that "whether a plaintiff has standing to challenge a search equates to

determining whether the plaintiff has a reasonable expectation of privacy in the property

searched").  Fourth Amendment protections "extend[] to guests staying in hotel rooms."  *United*

*States v. Coles*, 437 F.3d 361, 365 (3d Cir. 2006) (citing *Stoner v. California*, 376 U.S. 483, 490 (1964)); *United States v. Dockery*, 738 F. App'x 762, 764 (3d Cir. 2018) (holding that "a hotel guest is entitled to the same expectation of privacy to his hotel room as one is to his own home").

Citing *Minnesota v. Carter*, 525 U.S. 83, 90 (1998), the Government contends that Clayton does not have standing to assert a privacy interest in Room 214 because the premises were being used for illicit commercial activities.  In *Carter*, the Supreme Court recognized that "[p]roperty used for commercial purposes is treated differently for Fourth Amendment purposes from residential property."  525 U.S. at 90.  The Court held that two individuals who had visited an apartment for two and a half hours "for the sole purpose of packaging [] cocaine" did not have a legitimate expectation of privacy in the apartment because of the "purely commercial nature of the transaction … the relatively short period of time on the premises, and the lack of any previous connection between [the defendants] and the householder."  *Id*. at 86, 91; *see also United States v. Corona-Chavez*, 328 F.3d 974, 980 (8th Cir. 2003) (holding that the defendant "had no expectation of privacy" in another individual's hotel room "where he was present for five minutes in connection with a commercial transaction with a stranger").

Courts are less inclined to apply this commercial purposes exception when defendants are overnight guests at a home or hotel.  *See*, *e.g.*, *United States v. Ingram*, No. 04-201, 2005 WL 775930, at *3-6 (S.D. Ind. Mar. 25, 2005) (noting that "we all expect privacy in places where we sleep, even if we are there only temporarily and as a guest" (citing *Minnesota v. Olson*, 495 U.S. 91, 99 (1990)).  In addition, although the Government has presented evidence suggesting that the primary purpose of Clayton's stay in Room 214 was commercial and criminal, the evidence also shows that his stay was more than just a transitory visit, as in *Carter* and *Corona-Chavez*.  For example, the photographs introduced by the Government show that there were multiple personal

effects strewn about the room.  In addition, Minor 1 told the police that she had been "staying in Room 214."  (Tr. at 9.)  On this record, we decline to apply the exception noted in *Carter*.  *See Ingram*, 2005 WL 775930, at *4 (holding that "[r]egardless of whether [defendants] were in Room 102 ultimately for the purpose of staging [a] robbery, they were also staying there, sleeping there, and relaxing there in privacy.  Their conduct was enough to establish Room 102 as 'a temporarily private place whose momentary occupants' expectations of freedom from intrusion are recognized as reasonable.'"  (quoting *Olson*, 495 U.S. at 99)).

Clayton had a reasonable expectation of privacy in Room 214.  Accordingly, he has standing to invoke the protections of the Fourth Amendment as they relate to Room 214.[4]

### B.    There were exigent circumstances and probable cause for law enforcement's warrantless entry into Room 214

Sergeant Johnson and Officer Dean's collective inability to recall how they entered Room 214 is difficult to understand.  However, given the circumstances of this case, it doesn't matter how they entered the room.

"Warrantless searches and seizures inside someone's home (or in this case, a hotel room) are presumptively unreasonable unless the occupants consent or probable cause *and* exigent circumstances exist to justify the intrusion."  *Coles*, 437 F.3d at 365 (emphasis in original); *see also Kirk v. Louisiana*, 536 U.S. 635, 638 (2002) (reiterating that "police officers need either a warrant or probable cause plus exigent circumstances in order to make a lawful entry into a home" (citing *Payton v. New York*, 445 U.S. 573 (1980))).  At the time Johnson and Dean entered Clayton's motel room, both probable cause and exigent circumstances existed.

---

[4]    There is no dispute that Clayton had an expectation of privacy in the rental vehicle.  *See United States v. Alexis*, 169 F. Supp. 3d 1303, 1310 (S.D. Fla. 2016) (recognizing that "[a] driver generally has an expectation of privacy in a rental vehicle that he or she rents"), *aff'd*, 688 F. App'x 656 (11th Cir. 2017).

"Examples of exigent circumstances include, but are not limited to, hot pursuit of a suspected felon, the possibility that evidence may be removed or destroyed, and danger to the lives of officers or others." *Coles*, 437 F.3d at 366. "In these limited situations, the need for effective law enforcement trumps the right of privacy and the requirement of a search warrant, thereby excusing an otherwise unconstitutional intrusion." *Id.* (internal citation omitted). Several courts have held that "the potential sexual exploitation of a minor is an exigent circumstance." *Figueroa v. Mazza*, No. 11-3160, 2017 WL 1194648, at *9 (E.D.N.Y. March 30, 2017); *United States v. Shingles*, No. 15-45, 2015 WL 5895457, at *14 (M.D. Fla. Oct. 6, 2015) (collecting cases). Those courts have further held that "police investigating a missing or kidnapped child, particularly when coupled with evidence that the child is being sexually exploited, constitutes an exigency that allows warrantless entry into a home or hotel room where officers have an objectively reasonable belief the child is being held." *Figueroa*, 2017 WL 1194648, at *9 (collecting cases). Although the Third Circuit has not explicitly held that the potential sexual exploitation of a minor constitutes an exigent circumstance, we are satisfied that if faced with the issue and our set of facts, it would. Indeed, such activity is inherently "danger[ous] to the [life]" of the minor. *See Coles*, 437 F.3d at 366.

Clayton suggests that there was no exigency in this case because Minor 2 was above the age of consent in North Carolina. The exigent circumstances exception, however, "applies regardless of whether the minor's involvement is involuntary[] or voluntary." *United States v. King*, 560 F. Supp. 2d 906, 916 (N.D. Cal. 2008) (internal citations omitted) (citing *United States v. Kenfield*, 270 F. App'x 695 (9th Cir. 2008)). A minor's apparent consent to being the victim of a sex crime does not negate the necessity of an urgent response by law enforcement. Nor does the purported consent render an otherwise criminal act legal in this situation.

Dean testified that although she was "concerned," in this particular situation, "it wasn't what … would [be] consider[ed] exigent circumstances." (Tr. at 21-22.) She also testified that she has no recollection of Minor 1 "saying that she was in immediate danger upstairs. So at that point, it's just a – well-being check." (*Id*. at 38; *see also id*. at 35 (agreeing that "there [weren't] any exigent circumstances for [her] to get into the room")).) Dean's legal opinion on the matter is not determinative. The "exigent-circumstances exception is adjudged from an objective standpoint; 'the subjective intent of the officer is irrelevant.'" *Smith v. Bonds*, No. 15-6437, 2018 WL 2972671, at *4 (D.N.J. June 12, 2018) (quoting *United States v. Mallory*, 765 F.3d 373, 383 (3d Cir. 2014)). Regardless of whether Dean believed that there was an emergency justifying an immediate, warrantless response by law enforcement, under these circumstances, there was.

With regard to the probable cause prong of the warrantless entry standard, "[p]robable cause requires 'a fair probability that contraband or evidence of a crime will be found in a particular place.'" *Gomez v. Markley*, 385 F. App'x 79, 82-83 (3d Cir. 2010) (quoting *Illinois v. Gates*, 462 U.S. 213, 238 (1983)); *see also Orsatti v. New Jersey State Police*, 71 F.3d 480, 483 (3d Cir. 1995) (holding that "probable cause to arrest exists when the facts and circumstances within the arresting officer's knowledge are sufficient in themselves to warrant a reasonable person to believe that an offense has been or is being committed by the person to be arrested"). Here, we have no difficulty finding that there was probable cause to enter Room 214. Johnson and Dean were advised of potential solicitation involving a runaway juvenile at the Baymont. When they arrived at the Baymont, Minor 1 explained that she and another minor were being prostituted by Clayton. She also told the police that at that very moment, Clayton was in Room 214 with Minor 2. Under those circumstances, there was certainly a fair probability that

evidence of a crime would be found in Room 214.  The facts available to the police at that time would have led a reasonable person to believe that a sex crime was being or had been committed in Room 214.

Because there were exigent circumstances and probable cause at the time police entered Room 214, their warrantless entry into the room did not run afoul of the Fourth Amendment, regardless of whether they had consent to enter.  *See United States v. Smith*, 224 F. App'x 194, 200 (3d Cir. 2007) (finding warrantless entry "proper because of the existence of both probable cause and exigent circumstances"); *see also United States v. McMillion*, 472 F. App'x 138, 141 (3d Cir. 2012) (same).

### C.   The warrantless searches of Room 214 and Clayton's vehicle violated the Fourth Amendment

There is no dispute that law enforcement obtained signed consent forms from Clayton to search Room 214 and his rental vehicle.  However, this does not end our inquiry.  Although the consent forms are not timestamped, they show that Clayton signed them at the police station.  According to Sergeant Barbour, he did not take Clayton from the Baymont to the police station until about 1:15 p.m., so the earliest Clayton could have signed the forms was shortly after 1:15 p.m.  However, according to the CAD report and Barbour, the searches had concluded by 1:15 p.m., *before* Clayton could have signed the consent forms.  Moreover, law enforcement did not obtain warrants for the searches.

"To justify a search based on consent, the Government 'has the burden of proving that the consent was, in fact, freely and voluntarily given.'"  *United States v. Price*, 558 F.3d 270, 277 (3d Cir. 2009) (quoting *Bumper v. North Carolina*, 391 U.S. 543, 548 (1968)).  "[T]he voluntariness of a consent" depends on "the totality of the circumstances."  *Id*. at 278.  "Where an individual is aware of the search prior to her consent, that individual's *post hoc* consent

12

cannot be considered freely given." *United States v. Matthews*, No. 05-10073, 2006 WL 1581574, at *5-6 (D. Mass. March 1, 2006); *see also United States v. Arreguin*, 453 F. App'x 678, 680 (9th Cir. 2011) (holding that the defendant's "consent cannot be used to support the validity of the warrantless search because [the defendant] signed the consent form only after the search was conducted"); *United States v. Lewis*, 231 F.3d 238, 241 (6th Cir. 2000) (holding that "the government cannot rely on the consent form signed by [the defendant] to justify the search after the fact"); *United States v. Johnson*, No. 12-291, 2012 WL 5354601, at *7 (E.D. Pa. Oct. 31, 2012) (refusing to "allow[] police officers to obtain consent after the fact and turn an illegal entry and unreasonable home search into a permissible consent search").  Based on this case law, we find that the *post hoc* consent forms are ineffective.

The Government contends that "[w]hile Sergeant Barbour had difficulty remembering the exact sequence of events, the only reasonable conclusion to be drawn from the testimony and exhibits is that the defendant verbally consented to the search before signing the forms back at the police station."  (Gov. Supp. Opp. 7.)  In support of this assertion, the Government relies on Barbour's testimony that he would not have searched the room without verbal or written consent or a search warrant:

> Q.     Would you have searched that room without verbal or written consent or a search warrant?
>
> A.     No, ma'am.

(Tr. at 52.)  The Government cannot meet its burden of establishing a free and voluntary consent based on this testimony.  *See Price*, 558 F.3d at 277.  Barbour did not actually testify affirmatively that he obtained verbal consent from Clayton before beginning the searches. Instead, his testimony about what he "would have" done is tentative and speculative.  *Cf. United States v. Kash*, No. 13-330, 2015 WL 7188219, at *6 n.7 (E.D. Cal. Nov. 16, 2015) ("Although

Trooper Neff testified at the evidentiary hearing that he 'probably' would have conducted a K-9 sniff of the Ford Fusion if Kash had withheld his consent, this testimony is speculative and does not affect the court's analysis of whether Kash voluntarily gave his consent."), *aff'd*, 751 F. App'x 1007, 1010-11 (9th Cir. 2018) (holding that "the officer's testimony at the evidentiary hearing that he probably would have had his drug dog conduct a sniff search if Kash had not consented is irrelevant to the voluntariness analysis").

In addition, although the evidence shows that Clayton was generally compliant with law enforcement on the day in question, it does not automatically follow that he verbally consented to the searches before they occurred.  *Cf. United States v. Gooch*, 915 F. Supp. 2d 690, 716 (W.D. Pa. 2012) (holding that "[i]n circumstances of implied consent to search, the Government's burden is higher than in express consent cases").

On such an important issue, and without any evidence addressing the specific communications between Barbour and Clayton regarding the searches before they commenced, we are unwilling to draw such a significant inference in the Government's favor.  Contrary to the Government's self-serving assertion about the "only reasonable conclusion to be drawn" here (Gov. Supp. Opp. 7), one could reasonably conclude, based on the evidence, that law enforcement simply failed to obtain consent from Clayton before beginning the searches.

Next, the exigent circumstances exception does not save the Government here.  Police may "conduct a warrantless search or seizure when exigent circumstances require them to act with such alacrity that requiring them to first obtain a warrant would be unreasonable."  *Mallory*, 765 F.3d at 376.  However, "[o]nce the exigencies of the initial entry have dissipated, the police must obtain a warrant for any further search of the premises."  *Id.* at 384.  In *Mallory*, the defendant fled into a house when police spotted a gun in his waistband.  Once the police located

14

him in a bathroom, they arrested him and placed him in handcuffs.  As the defendant was

escorted out of the house, one of the officers seized a firearm located behind the front door.  *Id*.

at 377-78.  On appeal, the Third Circuit affirmed the district court's order suppressing the

firearm, holding that "once the officers had secured the premises and apprehended [the

defendant], the exigencies of the moment abated and the warrant requirement reattached."  *Id*. at

388.

We conclude, in light of *Mallory*, that the exigency in this case ended by 9:00 a.m., at

which point Clayton was handcuffed in Room 214 and the two minors had left the Baymont.  We

further conclude that because the searches commenced after 9:00 a.m., they were not justified by

the exigent circumstances exception.

Finally, we are cognizant that law enforcement may "seize evidence in plain view,

provided that they have not violated the Fourth Amendment in arriving at the spot from which

the observation of the evidence is made."  *See Kentucky v. King*, 563 U.S. 452, 463 (2011); *see

also United States v. Sculco*, 82 F. Supp. 2d 410, 418 (E.D. Pa. 2000) (holding that "[i]tems of

evidence spotted in plain view may properly be seized, so long as there are also exigent

circumstances and probable cause exists to believe that the items in question are evidence of a

crime or its contraband" (citing *Arizona v. Hicks*, 480 U.S. 321, 326 (1987))).  Although that rule

might theoretically apply in this case, its application is problematic.

First, the Government did not establish exactly what items the Dunn Police Department

seized and from where in the motel room they were seized.  Without this information, we cannot

determine what, if anything was in plain view.  Second, according to the police photographs,

there was one cell phone that was in plain view from the entrance to Room 214, but we do not

know whose phone it was or when it was seized.  The property receipts suggest that Officer Dean

15

took two cell phones from the room at about 8:40 a.m., when the exigent circumstances were arguably still present.  However, she denies taking the phones and believes that the statements on the property receipts connecting her to the phones may have been erroneous.  (*See* Tr. at 25-28.) Given all of these uncertainties, application of the plain view doctrine is inappropriate.

For these reasons, we conclude that the warrantless searches of Room 214 and Clayton's vehicle violated the Fourth Amendment.

### D. The Exclusionary Rule applies to all evidence seized from Room 214 and Clayton's rental vehicle

Having concluded that the searches of Room 214 and Clayton's rental vehicle were unreasonable under the Fourth Amendment, we must now consider "whether the circumstances warrant suppression of the evidence" under the exclusionary rule.  *See United States v. Dupree*, 617 F.3d 724, 730 (3d Cir. 2010).  "The exclusionary rule is a prudential doctrine that 'prevent[s] the government from relying at trial on evidence obtained in violation of the [Fourth] Amendment's strictures.'"  *United States v. Werdene*, 883 F.3d 204, 215 (3d Cir. 2018) (quoting *United States v. Franz*, 772 F.3d 134, 145 (3d Cir. 2014)).  "However, the rule is *not* intended to remedy Fourth Amendment violations, and does not necessarily apply each time a violation occurs."  *Id*. (emphasis in original).  "Put differently, 'there is no constitutional right to have the evidentiary fruits of an illegal search or seizure suppressed at trial.'"  *Id*. (quoting *United States v. Katzin*, 769 F.3d 163, 170 (3d Cir. 2014) (en banc)).  "Rather, the exclusionary rule aims to *deter* government violations of the Fourth Amendment."  *Id*. (emphasis in original).

"'[I]n determining whether the exclusionary rule applies, we engage in a cost-benefit analysis, balancing the deterrence benefits of suppression against its substantial social costs.'"  *Id*. (internal quotations omitted) (quoting *Franz*, 772 F.3d at 145).  "'To trigger the exclusionary rule, police conduct must be sufficiently deliberate that exclusion can meaningfully deter it, and

16

sufficiently culpable that such deterrence is worth the price paid by the justice system.'" *Franz*, 772 F.3d at 145 (quoting *Herring v. United States*, 555 U.S. 135, 144 (2009)). "In other words, 'the deterrence benefits of exclusion 'var[y] with the culpability of the law enforcement conduct' at issue." *Id.* (internal quotations omitted) (quoting *Davis v. United States*, 564 U.S. 229, 238 (2011)).

"When law enforcement 'exhibit[s] 'deliberate,' 'reckless,' or 'grossly negligent' disregard for Fourth Amendment rights, the deterrent value of exclusion is strong and tends to outweigh the resulting costs.'" *Id.* (quoting *Davis*, 564 U.S. at 238). When, however, "'the police act with an objectively reasonable good-faith belief that their conduct is lawful, or when their conduct involves only simple, isolated negligence, the deterrence rationale loses much of its force, and exclusion cannot pay its way.'" *Id.* (quoting *Davis*, 564 U.S. at 238). Because there are significant costs to exclusion, i.e., "'requir[ing] courts to ignore reliable, trustworthy evidence bearing on guilt or innocence' of the defendant and 'in many cases … to suppress the truth and set the criminal loose in the community without punishment,'" *Werdene*, 883 F.3d at 215 (quoting *Davis*, 564 U.S. at 237), "'[s]uppression of evidence … has always been our last resort, not our first impulse.'" *Id.* (quoting *Hudson v. Michigan*, 547 U.S. 586, 591 (2006)).

Although the Government has not asserted good faith or briefed the exclusionary rule, we interpret Third Circuit precedent to require that we conduct a "case-specific analysis" of these issues. *See Franz*, 772 F.3d at 144-45.[5] We are not aware of any cases addressing the good faith

---

[5]   There are "a number of [other] exceptions to the exclusionary rule, including the independent source, inevitable discovery, and attenuation doctrines." *United States v. Pelullo*, 173 F.3d 131, 136 (3d Cir. 1999). However, with the exception of its conclusory invocation of the inevitable discovery doctrine in a footnote (Gov. Supp. Opp. 7 n.5), the Government has not asserted any of these exceptions and we otherwise have no evidentiary basis on which to apply them. Accordingly, the Government has waived these issues. *See United States v. Rose*, 189 F. Supp. 3d 528, 544-45 (D.V.I. 2016) (citing *Dupree*, 617 F.3d at 728).

doctrine in this situation, where law enforcement appears to have obtained consent to search *after* conducting the search.[6]   However, one district court outside of our Circuit has recognized that "[t]o permit the police to avoid application of the exclusionary rule by obtaining consent after the preliminaries of [a] search have essentially been completed and the most suspicious item identified does severe damage to the goal of deterring unconstitutional searches and seizures." *United States v. Goodrich*, 183 F. Supp. 2d 135, 148 (D. Mass. 2001).  In addition, another court in this District has applied the exclusionary rule in a post-search consent case.  *See Johnson*, 2012 WL 5354601, at *10.  In *Johnson*, the court explained as follows:

> Officers illegally entered [Daniel] Johnson's home, searched his room and belongings, and then attempted to bless this conduct by seeking consent after the fact from Daniel Johnson's son[, Damir Johnson].  This is exactly the type of conduct the exclusionary rule aims to deter. Finally, the conduct here is particularly unreasonable because it was unnecessary.  If law enforcement had taken the simple step of seeking a warrant to search Daniel Johnson's apartment, any evidence obtained could have been used against him.  Officers watched Johnson conduct a drug transaction and arrested him. Officers could have driven Johnson to his apartment and presented a probable cause affidavit to a judge prior to searching the apartment.  The record provides no indication that officers feared Johnson's son would destroy evidence or jeopardize their investigation.  And if officers had that concern, they could have secured Damir Johnson while they waited to obtain a warrant.

*Id*.

Although, unlike in *Johnson*, law enforcement's entry into Room 214 was lawful, the sentiment expressed in *Johnson* applies here.  Given Clayton's compliance, we see no indication that police were unable to obtain consent before the searches began.  There is also no indication that law enforcement would have had difficulty obtaining a warrant to search Room 214 and the vehicle.  Moreover, given Clayton's detention, there was little risk of spoliation.

---

[6]     The parties did not brief the exclusionary rule or its application in this case.

We note that the law enforcement officers who were involved in this case and testified at the evidentiary hearing did not come across as malicious. Nevertheless, we are bewildered by some of their testimony, for example: Sergeant Johnson and Officer Dean's inability to recall how they entered Room 214; and their uncertainty regarding who seized Clayton's cell phones and when. The Government also failed to establish a detailed chronology of events, especially with respect to the four hours during which Clayton was detained at the Baymont. Based upon the record before us, we can infer nothing other than what the evidence plainly suggests: that law enforcement did not obtain Clayton's consent to search the room and car until after the searches had already occurred.

Although the police did not appear to act deliberately, their failure to obtain consent before conducting the searches rose to the level of recklessness or gross negligence. *See Franz*, 772 F.3d at 145. Their mistake was unacceptable. In this case, the deterrent value of exclusion is strong enough to outweigh the resulting costs. *See id*. The exclusionary rule requires suppression of all evidence seized from Room 214 and Clayton's rental vehicle.

### E.     The minors' cell phones

The Government asserts, separately and irrespective of the issue of consent, that Clayton lacks standing to challenge the admission of evidence obtained from the minors' cell phones, since the phones do not belong to him. The case on which the Government relies for this argument, *United States v. Brewer*, 708 F. App'x 96, 99 (3d Cir. 2017), stands for the proposition that a defendant lacks a legitimate expectation of privacy in a cell phone belonging to another person, such as a co-defendant. *See also Alderman v. United States*, 394 U.S. 165, 174 (1969) (recognizing that "Fourth Amendment rights are personal rights which, like some other constitutional rights, may not be vicariously asserted"); *United States v. Stringer*, 739 F.3d

391, 396 (8th Cir. 2014) (holding that defendant lacked standing to contest search of minor's cell phone and noting that "[t]o mount a successful motion to suppress, an accused must first establish that he personally has a legitimate expectation of privacy in the object that was searched").

As previously indicated, we do not know exactly from where the various evidence was obtained.  If the minors' cell phones were obtained from them personally, rather than from Room 214, we would agree with the Government that Clayton does not have Fourth Amendment standing with respect to the minors' phones.  *See Brewer*, 708 F. App'x at 97-99.  If, however, the minors' phones were seized from Room 214 or the vehicle, any evidence from the phones would potentially have to be suppressed as fruit of the poisonous tree.  *See United States v. Herrold*, 962 F.2d 1131, 1137 (3d Cir. 1992) (holding that "fruit of the poisonous tree" doctrine "requires the exclusion of tangible evidence seized during an unlawful search, and derivative evidence, both tangible and testimonial, acquired as a result of the unlawful search"); *United States v. Gordon*, 346 F. Supp. 3d 999, 1005-06 (E.D. Mich. 2018) (holding that a "defendant does not only have standing under this doctrine in relation to her own property, but also in relation to property or information from third parties that was obtained as a result of illegality by police").

Because we do not know how law enforcement came into possession of the minors' cell phones, we defer ruling on the admissibility of the phones at this time.  Assuming they provide the necessary factual background, the parties may raise this issue again before trial.

### F.    Clayton's Post-*Miranda* statements to law enforcement will not be suppressed

Clayton takes issue with his allegedly "unreasonable and prolonged detention … subsequent to his warrantless arrest" and asserts that all statements that he made to law

20

enforcement on March 15, 2018 should be suppressed as involuntary.  (Def.'s Mot. 11.)  Based

on the evidence presented to us, we are aware of only one interview that Clayton gave to law

enforcement, and this interview occurred after law enforcement informed him of his *Miranda*

rights.  We address the propriety of this interview and conclude that Clayton's statements during

the interview are not tainted by a Fourth Amendment violation.

       If an accused makes statements to law enforcement after waiving his *Miranda* rights,

those statements may still be suppressed as fruit of the poisonous tree if the waiver was not

voluntary or the statements were ultimately obtained as a result of an earlier Fourth Amendment

violation, such as an unlawful detention.  *See Colorado v. Connelly*, 479 U.S. 157, 169 (1986);

*United States v. Wade*, 628 F. App'x 144, 148 (3d Cir. 2015).  We address both possibilities in

turn.

       "[A] person can waive his *Miranda* rights, 'provided the waiver is made voluntarily,

knowingly, and intelligently.'"  *United States v. Richardson*, 265 F. App'x 52, 55 (3d Cir. 2008)

(quoting *Miranda v. Arizona*, 384 U.S. 436, 444 (1966)).  "In order to be valid: (1) 'the waiver

must have been voluntary in the sense that it was the product of a free and deliberate choice

rather than intimidation, coercion or deception' and (2) 'the waiver must have been made with a

full awareness both of the nature of the right being abandoned and the consequences of the

decision to abandon it.'"  *Id*. (internal quotations omitted) (quoting *United States v. Velasquez*,

855 F.2d 1076, 1084 (3d Cir. 1989)).

       Here, the evidence strongly suggests that Clayton's waiver was voluntary, knowing, and

intelligent.  First, Clayton executed a written waiver of his *Miranda* rights.  *See North Carolina

v. Butler*, 441 U.S. 369, 373 (1979) (holding that "[a]n express written or oral statement of

waiver of the right to remain silent or of the right to counsel is usually strong proof of the

validity of that waiver, but is not inevitably either necessary or sufficient to establish waiver"). Second, the interview did not begin until after Sergeant Barbour and Special Agent Whitworth read Clayton those rights. Third, based on the pre-interview video, Clayton did not appear resistant at all. Nor did he seem unable understand what was being communicated to him. If anything, he appeared nonchalant. Fourth, there is no indication that Clayton was subject to any conditions during his pre-interview detention that would have impeded his ability to make a free and deliberate choice to waive his *Miranda* rights.

Clayton suggests in his papers that his detention was lengthy and that he was deprived of adequate food, water, and access to the bathroom while he was in Sergeant Barbour's custody. However, Clayton failed to introduce any evidence of those alleged violations at the hearing. Moreover, the evidence suggests the opposite. Based on the video evidence and Barbour's testimony, Clayton was offered and accepted food and water at least twice during the relevant timeframe. With regard to Clayton's access to a restroom, there is no substantive evidence on this issue, other than that Barbour does not recall Clayton asking to use the restroom while they were in Barbour's vehicle. Finally, the post-interview video shows Clayton agreeing with Barbour that he had been fairly treated on March 15, 2018. Under these circumstances, we find no indication that Clayton's *Miranda* waiver was brought about by intimidation, coercion, or deception. *See United States v. Adeyemi*, 279 F. App'x 144, 147-48 (3d Cir. 2008) (refusing to find that the defendant's "custody in a room by himself for over four hours … somehow contributed to coercing his statement"); *United States v. Medina*, 19 F. Supp. 3d 518, 541 (S.D.N.Y. 2014) (collecting cases in which courts have upheld *Miranda* waivers where suspects were in custody for over eight hours).

Next, because "*Miranda* warnings alone do not necessarily render a [statement to law enforcement] free of the taint of an earlier Fourth Amendment violation," *Wade*, 628 F. App'x at 148, we consider whether Clayton's detention was lawful in the first place.   Although Clayton was not formally arrested until late in the afternoon, he was in some type of restrictive custody from the time law enforcement entered his hotel room in the morning, almost eight hours before the arrest.  Clayton calls this a "de facto" arrest.  (*See* Def.'s Mot. 11.)  We agree.  However, this kind of detention does not necessarily result in a constitutional violation.

Even though Clayton's detention amounted to a warrantless arrest, there is no constitutional violation if there was probable cause for the arrest, which there was.  *See United States v. Walker*, 47 F. App'x 851, 854 (9th Cir. 2002); *see also Devenpeck v. Alford*, 543 U.S. 146, 152 (2004) (holding that "a warrantless arrest by a law officer is reasonable under the Fourth Amendment where there is probable cause to believe that a criminal offense has been or is being committed").  As discussed above, the police had probable cause to enter Room 214 and arrest Clayton based on the information they obtained from Minor 1.  Their observation of Clayton on a bed with Minor 2 in the motel room made probable cause for his arrest even more palpable.

Finally, the Supreme Court has rejected the notion that "an arrest in a home without a warrant but with probable cause … renders unlawful continued custody of the suspect once he is removed from the house."  *New York v. Harris*, 495 U.S. 14, 18 (1990).  Because courts treat homes and hotel rooms similarly under the Fourth Amendment, *see Dockery*, 738 F. App'x at 76, we conclude, in light of *Harris*, that there is no automatic constitutional violation when an individual subject to a warrantless arrest in a hotel room is kept in custody even after being removed from the hotel.

23

We are satisfied that Clayton's detention was lawful.  His post-*Miranda* statements to law enforcement are not subject to suppression.

**III.** **CONCLUSION**

For the foregoing reasons, Clayton's Motion to Suppress will be granted in part and denied in part.  An appropriate order follows.

**BY THE COURT:**

**/s/ R. Barclay Surrick**
**R. BARCLAY SURRICK, J.**